IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TRACY A. DEMSHICK,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 05-2251** |
| | : | |
| **DELAWARE VALLEY CONVALESCENT** | : | |
| **HOMES, INC., et al.,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**STENGEL, J.** **April 26, 2007**

Plaintiff Tracy Demshick alleges that her employer Delaware Valley Convalescent Homes, Inc., d/b/a Silver Lake Center ("Silver Lake Center") failed to accommodate her disability. Demshick has Meniere's disease, a condition that causes severe vertigo, nausea, and an unsteady gait. Silver Lake Center asserts that it terminated Demshick because she violated their "No Call/No Show" policy and moved for summary judgment on her claims. For the reasons stated below, I will deny the motion.

## I. BACKGROUND[1]

Silver Lake Center is a two-story nursing and rehabilitation center. Def's Statement Undisputed Facts ¶ 2. The facility has an elevator and stairs. Id. There are three units at Silver Lake Center. Id. ¶ 4. The Paradise and Rose Garden Units are on the first floor; the Star Village Unit is on the second floor. Id. ¶ 5. There are three

[1] For the purposes of this motion, the Court will make all inferences in plaintiff's favor as she is the non-moving party.

working shifts: 7:00 a.m. to 3:00 p.m.; 3:00 p.m. to 11 p.m.; and 11 p.m. to 7 a.m. Id. ¶ 6. Shirley Pearce prepared the nursing schedules beginning in 1998 to November 2004. Id. ¶ 7. Pearce posted daily schedules each morning. Id. ¶9.[2]

**A. Demshick's Medical Condition**

Sometime between 1994 and 1996, Demshick was diagnosed with Meniere's disease. Def's Statement Undisputed Facts ¶ 32. Demshick experiences the following symptoms as a result of this condition: severe vertigo, nausea, vomiting, pressure, ringing in the ears, unsteady gait, falling over, faintness, lightheadedness, tremors, heart racing, blurred vision, and lack of concentration. Id. In particular, the vertigo causes a loss of balance that leads to a risk of falling that make it dangerous for Demshick to walk up stairs. Dr. Richard Goldhammer Dep. pp. 31-32. Between January 2002 to July 2004, while Demshick worked at Silver Lake Center, she had attacks approximately three to four times a week. Def's Statement Undisputed Facts ¶ 35. These attacks lasted from half an hour to several hours. Id. ¶ 36. Plaintiff takes Zoloft, Xanax, Claritin, and a nose spray to assist in controlling Meniere's disease and symptoms; however, these medications do not fully control the disease or its symptoms. Id. ¶ 37; Pl's Statement Facts Dispute ¶ 38.

Demshick's Meniere's disease interferes with major life activities such as

[2] The parties dispute how far in advance Pearce prepared the daily schedules. This dispute is not material.

walking, standing swimming, running, roller skating, and going to a night club.[3] Def's Statement Undisputed Facts ¶ 39. The disease affects her equilibrium and balance, which affects her ability to stand. Id. ¶ 42; Pl's Statement Facts Dispute ¶ 42. Demshick testified that her ability to stand was affected if she had to walk up stairs and that she could not work on the second floor because it made her dizzy, shaky, unable to concentrate, and feel like she was going to vomit. Demshick Dep. pp. 93-94. Demshick can normally walk at least two blocks.[4] Pl's Statement Facts Dispute ¶ 40. Depending on the severity of an attack, Demshick may not be able to walk at all. Id. After an attack, Demshick may have to lay down and her gait may be unsteady once she resumes walking. Id. ¶ 41. Demshick does not wear a hearing aid but has sustained permanent hearing loss that affects her ability to hear. Id. ¶ 43. Dr. Richard Goldhammer, Demshick's physician, testified that she has periods of exacerbations and remissions with respect to her Meniere's disease. Def's Statement Undisputed Facts ¶ 46.

### B. Demshick's Employment at Silver Lake Center

Demshick has a GED diploma and a Practical Nurse Degree. Def's Statement Undisputed Facts ¶ 1. On October 13, 2003, Silver Lake Center hired Demshick for weekend employment as a Licensed Practical Nurse. Id. ¶ 13. Prior to this, Demshick had been employed at Silver Lake Center from February 2002 to April 2003 through

---

[3] In her response in opposition to defendant's motion for summary judgment, Demshick argues that walking and standing are her only major life activities substantially limited by Meniere's disease.

[4] At her deposition, Demshick was asked whether she could walk five or ten blocks and she answered that it depended on how she felt that day. Demshick Dep. p. 191.

Healthskill, a nursing agency. Id. ¶ 15. While working for Healthskill, Demshick worked on the second floor of the Silver Lake Center, although she told several Healthskill employees that she could not work on the second floor. Id. ¶ 16; Pl's Statement Facts Dispute ¶ 15.

Kristin Parell, the Director of Nursing at Silver Lake Center, interviewed Demshick for the position. Def's Statement Undisputed Facts ¶ 18. At the interview, Demshick told Parell that she had Meniere's disease and that she could not work on the second floor of the Silver Lake Center facility. Id. ¶ 18. Parell told Demshick that this was "not a problem" because the facility had "plenty of time for downstairs." Pl's Statement Facts Dispute ¶ 19. Demshick's physical form, submitted at the time of her hire, does not indicate that Demshick has Meniere's disease or set forth any restrictions in connection with Plaintiff's employment. Def's Statement Undisputed Facts ¶ 20.[5]

**(1) May 2004 Schedule Changes**

In May 2004, Silver Lake Center decided to rearrange the schedules of the nursing staff in order to avoid lay-offs. Def's Statement Undisputed Facts ¶¶ 22-23. New scheduling assignments would be based on seniority. Id. ¶ 25. Silver Lake Center held a meeting regarding the adjustment of schedules and asked nurses to submit scheduling requests. Id. ¶ 24. Demshick did not know about the meeting, did not attend the

[5] The form does list the medications that Demshick takes for Meniere's disease (Xanax, Claritin, and Zoloft) and indicates that Demshick's "head/eyes/ears/nose/throat" are abnormal with an illegible notation. Def's Mot. Summ. J. Ex. 10.

meeting, and did not submit a proposed schedule. Id. ¶¶ 26-27. Because the schedules were allocated based on seniority, Silver Lake Center determined that Demshick would have to work on the second floor two days a week. Id. ¶ 28.[6] Demshick testified that both Shirley Pearce, who wrote the schedule, and Kristen Parell, the Director of Nursing, knew about her condition and that she could not work on the second floor. Pl's Statement Facts Dispute ¶ 48 n. 2.

**(2) Demshick's Request for an Accommodation**

The parties dispute when Demshick requested an accommodation to only work on the first floor because of her condition; however, this accommodation only became an issue after the May 2004 scheduling changes. Parell requested that Demshick submit a physician's note documenting her condition and its limitations. Def's Statement Undisputed Facts ¶ 49. Demshick responded that Parell already knew about her condition because she had told Parell at her initial interview that she could not work on the second floor.[7] Pl's Statement Disputed Facts ¶ 50.

On May 14, 2004, Demshick submitted a note from Dr. Goldhammer that stated that Demshick had Meniere's Disease and could not work upstairs. Def's Statement Undisputed Facts ¶ 53; see also Def's Ex. 13. Demshick discussed this request with

---

[6] Demshick asserts that Silver Lake Center has not submitted proof that it had a bona fide seniority program or that Demshick did not have seniority. Pl's Statement Disputed Facts ¶¶ 101-106.

[7] Silver Lake Center argues that Demshick did not disclose her condition on her employment application. However, Parell testified that there was no place on the document for Demshick to list her disability and request an accommodation and that Silver Lake Center did not give prospective hires any other document requesting information regarding disabilities and accommodations. Pl's Statement Dispute Facts ¶ 50 n.3.

Pearce, as Parell had suggested. Def's Statement Undisputed Facts ¶ 54. After Demshick submitted the doctor's note to Pearce, Pearce told Demshick that it "doesn't matter if you have a doctor's note or not, I have to go by what [Parell] says. [Parell] tells me not to change your schedule." Pl's Statement Disputed Facts ¶ 58.

On May 11, 2004, Demshick was scheduled to work on the second floor. Pl's Statement Facts Dispute ¶ 29. However, she was able to find a replacement nurse to take her shift. Id. If she had not been able to find a replacement, Silver Lake Center would have required her to work on the second floor. Id.

**(3) Demshick's Alleged Violation of the "No Call/No Show" Policy and her Termination**

On July 27, 2004, Demshick agreed to work to pick up extra time. Pl's Statement Facts Dispute ¶ 61. Pearce scheduled Demshick to work on the second floor. Def's Statement Undisputed Facts ¶ 63. Demshick learned about this on July 22, 2004 and discussed changing this with Parell and Pearce, who both told her that the schedule could not be changed. Id. ¶¶ 64-65. Demshick verbally notified Pearce and Parell a week before July 27, 2004 that she would not report to work on July 27, 2005. Pl's Statement Disputed Facts ¶ 69; see also Demshick Dep. pp. 142-44.

Demshick did not report to work on July 27, 2004 and received a disciplinary report for "failure to report to work for her scheduled shift and to notify the facility through proper calling procedures." Def's Statement Undisputed Facts ¶¶ 71, 73. Under Silver Lake Center's policy, the first "No Call/No Show" is grounds for disciplinary

action but not termination. Id. ¶ 74. Parell advised Demshick via the telephone about the disciplinary warning and Demshick confirmed that she would be at work on July 29, 2004. Id. ¶ 75. Demshick did not show up for work on July 29, 2004 and did not call Silver Lake Center. Id. ¶ 76. Demshick testified that she had not gone to work on July 29 because Silver Lake Center had terminated her for having two "No Call/No Show" policy violations. Pl's Statement Disputed Facts ¶ 78. Silver Lake Center terminated Demshick on July 30, 2004 for violating its "No Call/No Show" policy. Def's Statement Undisputed Facts ¶ 82.

**(4) Demshick's Allegations of Discrimination and Retaliation and Direct Evidence of Discriminatory Animus**

Silver Lake Center refused to provide a reasonable accommodation (only scheduling Demshick to work on the first floor) for her disability. Def's Statement Undisputed Facts ¶ 83. Silver Lake Center fired Demshick for not working on the second floor. Id. ¶ 84.

Co-workers also verbally abused Demshick in retaliation for not working upstairs. Id. ¶ 85. Mary Foster, a Silver Lake Center supervisor, stated that it seemed "kind of odd" that Demshick had not gone upstairs and a co-worker commented that "there was something wrong" with Demshick because she did not work upstairs. Id. ¶ 86.

After the May 2004 scheduling changes, Silver Lake scheduled her to work on the second floor. Demshick offered to bring in a doctor's note to document her disability but Parell told her "Well, it doesn't matter because we don't have to honor your disability

anyways [because] it's not in your application." Demshick Dep. p. 167.[8]

On July 22, 2004, Demshick received a phone message that she recognized as being from Parell. Pl's Statement Disputed Facts ¶¶ 94-95. Parell stated that since the schedules had been revised on the basis of seniority, Demshick would be scheduled on the second floor. Id. ¶ 96. Parell also said that she had done some research on Meniere's disease and believed that Demshick "could fly in a plane and scuba dive" even though she suffered from the disease. Id. ¶ 97. Parell added that since Demshick's application did not state that she was disabled, Silver Lake Center did not have to honor her disability. Id.

C. **Procedural History**

Demshick filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission on August 3, 2004. Def's Statement Undisputed Facts ¶ 88. On February 22, 2005, Demshick received her right to sue letter from the EEOC. Compl. ¶ 23. On May 12, 2005, Demshick filed a complaint for disability discrimination and retaliation in violation of the (1) the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"); (2) the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. ANN. § 951 et seq. (the "PHRA"). Demshick's complaint also contained a state law count for intentional infliction of emotional distress, which the court dismissed. Demshick v.

[8] Neither party attached this page of Ms. Demshick's deposition. For the purposes of this motion, the court will assume that Demshick testified to this statement.

Delaware Valley Convalescent Homes, Inc., No. 05-2251, 2005 U.S. Dist. LEXIS 16390 (E.D. Pa. Aug. 9, 2005). Defendant moved for summary judgment on August 24, 2006; Demshick responded in opposition on September 25, 2006.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party initially bears the burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A fact is "material" only when it could affect the result of the lawsuit under the applicable law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." Id. The moving party must establish that there is no triable issue of fact as to all of the elements of any issue on which the moving party bears the burden of proof at trial. See In re Bessman, 327 F.3d 229, 237-38 (3d Cir. 2003) (citations omitted).

After the moving party has met its initial burden, “the adverse party’s response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that

there is a genuine issue for trial." FED. R. CIV. P. 56(e); see also Williams v. West Chester, 891 F.2d 458, 464 (3d Cir. 1989). A motion for summary judgment looks beyond the pleadings and factual specificity is required of the party opposing the motion. Celotex, 477 U.S. at 322-23. In other words, the non-moving party may not merely restate allegations made in its pleadings or rely upon "self-serving conclusions, unsupported by specific facts in the record." Id. Rather, the non-moving party must support each essential element of its claim with specific evidence from the record. See id.

A district court analyzing a motion for summary judgment "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in favor of that party. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted). Summary judgment is therefore appropriate when the court determines that there is no genuine issue of material fact after viewing all reasonable inferences in favor of the non-moving party. See Celotex, 477 U.S. at 322.

## III. DISCUSSION

### A. Disability Discrimination Claims

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Pennsylvania law also prohibits discrimination

on the basis of a disability.[9] Demshick brings two disability discrimination claims under federal and state law for disparate treatment and failure to provide a reasonable accommodation. As a threshold requirement, Demshick must satisfy the ADA's standard for a qualified individual with a disability in order to be protected under this statute.

**(1) Demshick presents a genuine issue of material fact concerning whether she is a qualified individual with a disability and protected by the ADA.**

A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A person has a "disability" is she meets any of these three standards: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Demshick argues that Meniere's disease is a physical or mental impairment that substantially limits her major life activities.

---

[9] The PHRA provides in relevant part: "It shall be an unlawful discriminatory practice, . . . (a) For any employer because of...non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required." 43 PA. CONS. STAT. ANN. § 955(a). Since the PHRA definition of disability is substantially similar to the ADA definition, a district court should treat PHRA and ADA claims coextensively. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). Therefore, this court will analyze Demshick's state law claims under the same standard as her ADA claims.

**(a) Physical Impairment**

The EEOC regulations do not list specific physical conditions that qualify but instructs that physical impairment means "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 CFR 1630.2 (h)(1). The Third Circuit has not addressed whether Meniere's disease constitutes a physical impairment under the ADA. Other courts have found that plaintiffs suffering from Meniere's disease suffer from a qualifying physical disorder. Brennan v. Naperville Sch. Dist. 203, No. 04-2530, 2005 U.S. Dist. LEXIS 30963, at *4 (E.D. Ill. 2005) ("Meniere's disease is a physical or mental impairment within the meaning of the ADA"); Dlugos v. Eastman Kodak Co., No. 95-1525, 1996 U.S. Dist. LEXIS 21891, at *15 (W.D. Pa. Sept. 5, 1996) (finding that a plaintiff suffering from Meniere's disease and experiencing dizziness and tinnitus had a qualifying physical impairment, but that this impairment did not substantially limit a major life activity).[10]

Dr. Goldhammer has diagnosed Demshick with Menier's disease. Demshick's symptoms include: severe vertigo, nausea, vomiting, pressure, ringing in the ears,

[10] Defendants cite cases in support of the proposition that various courts have rejected Meniere's disease as a disability under the ADA. Def's Mot. Summ. J. p. 7. While these courts have ultimately dismissed disability discrimination claims, these rejections are not because Meniere's disease is not a qualifying physical disorder but because the plaintiffs have failed to establish another essential element.

unsteady gait, falling over, faintness, light-headedness, tremors, and heart racing. Demshick's weekly attacks caused blurred vision, lack of concentration, and limited her ability to walk. Based on these facts, Demshick has a physical impairment within the meaning of the ADA.

**(b) Substantially limit a major life activity**

Demshick easily satisfies the second part of the analysis: identifying a major life activity that is limited by her impairment. While the ADA does not define major life activity, the EEOC regulations define this term to mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 CFR 1630.2 (i). Demshick asserts that Meniere's disease has affected her major life activities of walking and standing.

Satisfying the third step of the analysis is much harder and has been fatal to other claims by plaintiffs suffering from Meniere's disease. Bankston v. Chertoff, 460 F. Supp. 2d 1074, 1090 (D. N.D. 2006) (plaintiff with Meniere's disease failed to establish that his disability substantially limited a major life activity because he admitted and his co-workers observed that his medical conditions did not affect his job performance); McGuire v. Miami-Dade County, 418 F. Supp. 2d 1354, 1364 (S.D. Fla. 2006) (holding that plaintiff's Meniere's disease did not substantially limit her ability to move and balance because the disease's affects on her were intermittent and caused only occasionally losses of balance); Brennan, 2005 U.S. Dist. LEXIS 30963, at *13-14

(finding that plaintiff had not raised a genuine issue of fact as to whether Meniere's disease substantially limited her ability to walk because she was only impaired during attacks and the record did not disclose how often she had attacks or how long they lasted). Demchick has the burden of showing that Merniere's disease has substantially limited her ability to walk and stand. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

EEOC guidelines assist courts in determining whether a plaintiff has been substantially limited in performing a major life activity. The EEOC defines substantially limited as either being "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 CFR 1630.2(j)(1). To determine whether an individual is substantially limited, courts should consider the following factors: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id. at (j)(2).

Recently, the Third Circuit has emphasized that determining whether an individual has a disability within the meaning of the ADA is an "extraordinarily fact-intensive" inquiry that must be conducted on an individual basis because "even if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuance of

its effect on their daily lives will invariably manifest themselves in distinct ways. Case law in this area is therefore useful primarily in setting helpful benchmarks by which a court can gauge the severity of a plaintiff's impairment." Emory v. Astrazeneca Pharm. LP., 401 F.3d 174, 181-82 (3d Cir. 2005). A plaintiff establishes a genuine issue of material fact if she presents enough evidence from which a factfinder could conclude that she is substantially limited in her ability to perform functions in comparison to an average individual in the general population. Id. at 182.

The Third Circuit has noted that "[i]t is difficult, indeed perhaps not possible, to draw a bright line delineating the point at which a condition affecting an employee's ability to walk can be regarded as a disability within the ADA. Kelly, 94 F.3d at 108. An examination of federal cases on this issue shows there is no bright line rule. The Third Circuit held that a plaintiff with a degenerative joint disease who could walk more than a mile and climb stairs was not substantially limited in his ability to walk. Id. Other courts have held that a plaintiff is substantially limited when, like Demshick, she is only able to walk up to two city blocks. United States EEOC v. E.I. du Pont de Nemours & Co., 406 F. Supp. 2d 645, 657 (E.D. La. 2005) (plaintiff who could walk two city blocks and walk up the five steps leading to her house was substantially limited); Carbaugh v. Pangborn Corp., No. 00-2719, 2001 U.S. Dist. LEXIS 1409, at *8-11 (D. Md. 2001) (plaintiff who could not walk more than one hundred feet or stand more than ten to fifteen minutes was substantially limited); EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 438 (7th Cir. 2000)

(a plaintiff who could only walk one city block was substantially limited); Canis v. Coca-Cola Enters., 49 F. Supp.2d 73, 79 (D. R.I. 1999) (plaintiff who could only walk or be on her feet for four hours at a time is substantially limited).

Keeping in mind the Third Circuit's dictate that this is an individualized and fact-intensive inquiry, Demshick alleges enough facts to establish an issue of fact concerning whether she is significantly limited in her ability to walk and stand in comparison to the general population. While Demshick can typically walk two blocks, she cannot walk at all during a severe attack. While working at Silver Lake Center, Demshick experienced attacks lasting from half an hour to several hours three to four times a week. Meniere's disease also affects her ability to stand, particularly after walking to the second floor. Demshick testified that she could not work on the second floor because walking upstairs made her feel dizzy, shaky, unable to concentrate, and like she was going to vomit. A reasonable jury could conclude that Demshick is substantially limited in her ability to walk and stand.

**(2) Disparate Treatment claim**

To establish a *prima facie* case of discrimination under the ADA, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Taylor v. Phoenixville Sch. Dist.,

184 F.3d 296, 306 (3d Cir. 1999) (citations and quotations omitted). The court has already determined that Demshick presents a genuine issue of material fact that she is a qualified individual with a disability under the ADA. Silver Lake Center does not argue that Demshick was not qualified to perform her job. Finally, termination qualifies as an adverse employment action. Therefore, Demshick has pled a *prima facie* case of disability discrimination.

**(a) Demshick presents direct evidence that discrimination was a motivating factor in Silver Lake Centers decision to fire her.**

Silver Lake Center urges the court to apply the familiar burden-shifting analysis established by the Court in McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973). The Third Circuit permits courts to apply the mixed motive analysis set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) in disability discrimination cases if a plaintiff produces direct evidence revealing discriminatory animus. Buchsbaum v. Univ. Physicians Plan, 55 Fed. Appx. 40, 45 (3d Cir. 2002). This standard is demanding on the employer because "the burden of proof shifts from the plaintiff to the employer to prove that its motives for the employment action were 'mixed' that is, while some motives were discriminatory, the employer had legitimate non-discriminatory motives as well which would have resulted in the adverse employment action." Id. In order to seek the benefit of less onerous Price Waterhouse standard, the employee must present direct evidence that links the discriminatory attitude of a decision maker to the adverse employment

action. Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). So called "stray remarks," which are statements by non-decision makers or statements by decision makers that are not related to the decision making process, do not constitute direct evidence and do not shift a plaintiff's burden of proof. Price Waterhouse, 490 U.S. at 277; Rand v. Mannesmann Rexroth Corp., No. 01-3564, 2002 U.S. Dist. LEXIS 6405, at *14 (E.D. Pa. 2002) (finding telephone message by one employee that included a derogatory comment about the plaintiff's age was a stray remark because the employee had no supervisory responsibility over the plaintiff therefore the remark was not probative of plaintiff's age discrimination claim).

Demshick presents direct evidence that Silver Lake Center discriminated against her based on her disability. Demshick alleges that she told Parell, the Director of Nursing, that she had Meniere's disease and could not work on the second floor at her initial interview. When Silver Lake scheduled her to work on the second floor after the May 2004 scheduling changes, Demshick offered to bring in a doctor's note to document her disability but Parell told her "Well, it doesn't matter because we don't have to honor your disability anyways [because] it's not in your application." Parell repeated this discriminatory statement in a phone message on July 22, 2004. In that message, Parell informed Demshick that she would be scheduled to work on the second floor. Parell told Demshick that she had researched Meniere's disease and learned the Demshick could fly in a plane and scuba dive despite her diagnosis. Parell again repeated that since

Demshick's application did not state that she was disabled, Silver Lake Center did not have to honor her disability. Shortly thereafter, Silver Lake Center scheduled Demshick to work on the second floor and then fired her when she did not show up for this shift.

Parell's statements are not stray remarks. They are direct evidence of discriminatory animus from which a jury could find that disability discrimination was more likely than not a motivating factor in Silver Lake Center's decision to terminate Demshick. Parell was a decision maker with authority to terminate employees and ultimately did terminate Demshick. Moreover, Parell's statements are unambiguous. Parell references Demshick's disability, expresses doubt that this is a valid disability, and expressly states that Silver Lake Center will not accommodate this disability. This is sufficient evidence for Demshick to survive summary judgment. Under Price Waterhouse, the burden then shifts to Silver Lake Center to show that it would have made the same decision to terminate Demshick anyway.

**(b) Demshick also creates a genuine issue of material fact that Silver Lake Center's reason for firing her was pretextual.**

Even if the court found Demshick's evidence of discriminatory animus insufficient and proceeded under the burden-shifting framework of McDonnel Douglas, Demshick has alleged sufficient facts to show that Silver Lake Center's reason for terminating Demshick, her violation of their "NoCall/No Show" policy, is pretextual.

Once a defendant produces a legitimate, non-discriminatory reason, the burden shifts to the plaintiff to demonstrate by a preponderance of the evidence that the

defendant's articulated reasons for terminating her are a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). Therefore, to avoid summary judgment, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Specifically, a plaintiff must cast substantial doubt on a number of defendant's legitimate non-discriminatory reasons by demonstrating weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions. Id. at 765.

Demshick provides an adequate factual basis from which a reasonable jury could disbelieve Silver Lake Center's articulated reason for terminating her or find that disability discrimination was more likely than not a determinative factor in its decision to fire her. Demshick asserts that she told Parell during her interview that she could not work on the second floor because she suffered from Meniere's disease. Parell stated that Silver Lake Center would accommodate her. Nine months later, Parell denied that Demshick had disclosed her condition at the time of her hire and explicitly stated that Silver Lake Center did not have to accommodate her disability and would not. Even after Parell brought in a doctor's note stating that she could not work on the second floor because of her condition, Silver Lake Center scheduled her to work on the second floor. Demshick told Parell that she could not work on the second floor in advance of her shift

on July 27, 2004 and did not show up for the shift. Silver Lake Center issued a Demshick a disciplinary warning and ultimately terminated her. While Demshick's version of the events conflicts with Silver Lake Center's account, this creates a factual dispute to be weighed by the jury. For the purposes of this motion, Demshick has adequately pleaded her disparate treatment claim.

**(3) Failure to accommodate claim**

Under the ADA, employers are required to provide "a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).[11] Reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position or...to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R § 1630.2 (o)(1)(ii)-(iii). The ADA defines reasonable accommodation expansively, as including but not limited to making facilities accessible; restructuring jobs or modifying work schedules; modifying training materials, policies,

[11] The PHRA also imposes a duty to reasonably accommodate and the analysis of a reasonable accommodation is identical under the PHRA and the ADA. Majtan v. Weck, No. 99-718, 2000 U.S. Dist. LEXIS 13817, at *15 n.5 (E.D. Pa. 2000).

equipment and devices. Id. at (o)(2) .

The ADA regulations advise that in order to determine an appropriate accommodation "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R § 1630.2 (o)(3). The Third Circuit has also approved of the value of the interactive process:

> When the interactive process works well, it furthers the purposes of the...ADA. The employers will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities, especially in a large company. Thus, the interactive process may often lead to the identification of a suitable position. If it turns out there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA...violation. Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997).

"[B]oth parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312 (3d Cir. 1999). In particular, an employer is obligated to initiate an interactive process with an employee in need of accommodation. Coleman v. Keystone Freight Corp., 142 Fed. Appx. 83, 86 (3d Cir. 2005) (citing Conneen v. MBNA Am. Bank, 334 F.3d 318, 330 (3d Cir. 2003)). A plaintiff can show that her employer breached its duty to provide a reasonable accommodation by failing to participate in the interactive process in good faith by showing that " 1) the employer knew about the employee's disability; 2)

the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 772 (3d Cir. 2004) *cert. den.* 544 U.S. 961 ( 2005) (citing Taylor, 184 F.3d at 319-320)).

Demshick has adequately pleaded her failure to accommodate claim. During her initial interview at Silver Lake Center, Demshick disclosed her condition (Meniere's disease) and requested an accommodation (to work only on the first floor). This was a sufficient request for an accommodation. See Taylor, 184 F.3d at 313 ("requests for reasonable accommodations do not need to be in writing...an individual may use plain English and need not mention the ADA or use the phrase reasonable accommodation.") (internal citations omitted). The record strongly suggests that Silver Lake Center could have accommodated Demshick because it did do so until the May 2004 scheduling changes. From this point forward, Silver Lake Center made no efforts to accommodate Demshick's disability and did not engage in the interactive process.

Silver Lake Center argues that summary judgment is appropriate because it did not deny Demshick a reasonable accommodation because it never scheduled her to work on the second floor. Demshick denies this, stating that Silver Lake Center scheduled her to work on the second floor on May 11, 2004, although Demshick found a replacement, and

on July 27, 2004, when Demshick did not report to work. To the extent that Silver Lake Center is arguing that it did not have to participate in the interactive process because there was no way to feasibly accommodate Demshick's disability after the threat of lay-offs and May 2004 scheduling adjustment, the Third Circuit has foreclosed this argument. While an employer is not liable for a failure to accommodate if no reasonable accommodation is possible, "the employer will almost always have to participate in the interactive process to some extent before it will be clear that it is impossible to find an accommodation that would allow the employee to perform the essential functions of a job." Taylor, 184 F.3d at 317. Here, there is no evidence that Silver Lake Center participated in the interactive process in good faith once Demshick's accommodation became an issue after May 2004. In fact, Demshick has presented evidence that Silver Lake Center felt that it had no duty to accommodate her disability. Since there remains a genuine issue of material fact as to whether Silver Lake Center provided Demshick with a reasonable accommodation, summary judgment is inappropriate.

### B. Retaliation Claims

The ADA provides that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). The PHRA also prohibits retaliation. 43 PA. CONS. STAT. ANN. § 955(d) (stating that is it unlawful for an employer to discriminate "against any individual because such individual

has opposed any practice forbidden by this act, or because such individual has made a charge...under this act.").

**(1) Exhaustion of administrative remedies**

A plaintiff must exhaust administrative remedies as a prerequisite to sue under the ADA or the PHRA. Churchill v. Star Enterprises, 183 F.3d 184, 190 (3d Cir. 1999). This requirement evinces a preference for settling matters through administrative conciliation instead of formal court proceedings and should be broadly construed. Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 399 (3d Cir. 1976). The test in the Third Circuit for exhaustion of administrative remedies is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior E.E.O.C. complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (citing Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)); see also Ostapowicz, 541 F.2d at 399 ("...courts allow plaintiffs to sue for any Title VII violations which can reasonably be expected to grow out of the charge of discrimination.").

Silver Lake Center argues that Demshick's retaliation claim must fail because she did not exhaust her administrative remedies. On her EEOC charge form, Demshick only checked disability, and not retaliation, as the cause of the discrimination. Def's Mot. Summ. J. Ex. 17. However, "a plain reading" Demshick's narrative reveals a claim for retaliation as well. Reddinger v. Hosp. Cent. Servs., Inc., 4 F. Supp. 2d 405, 410 (E.D. Pa. 1998). Specifically, Demshick states that she told Parell when Silver Lake Center

hired her in October 2003 that she had to work on the first floor because of her disability. Def's Mot. Summ. J. Ex. 17. However, in May 2004, Parell told Demshick she had to work upstairs. Id. Demshick them provided Parell with a doctor's note detailing her disability. Id. On July 22, 2004, Demshick saw she was on the upstairs schedule for July 27, 2004 and again informed Parell that she could not work upstairs. Id. Parell stated that she did not have to honor Demshick's disability because it was not on her employment application. Id. Demshick did not work on July 27, 2004 and was terminated. Id. Demshick also alleges these facts in her ADA Intake Questionnaire. Def's Mot. Summ. J. Ex. 21. This sufficiently exhausts Demshick's administrative remedies as to the retaliation claim, even if she failed to check off the retaliation box on her initial EEOC charge of discrimination. Demshick's retaliation claim could reasonably be expected to grow out of her charge of disability discrimination.[12]

**(2) Demshick has demonstrated a causal connection between her request for an accommodation and termination.**

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show "(1) the employee engaged in a protected employee activity; (2) the employer took an

[12] The cases Silver Lake Center cites in support of their argument are distinguishable. In two of those cases, the courts affirmed dismissal because plaintiffs sought to pursue a completely new and distinguishable theory, which had not been in the scope of the initial EEOC charge and investigation. See Spindler v. SEPTA, 47 Fed. Appx. 92 (3d Cir. 2002) (affirming dismissal of race discrimination claims when plaintiff had only pursued a disability claim with the EEOC); Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (finding that the EEOC would not have been put on notice of plaintiff's gender discrimination claim from the initial EEOC charge for disability discrimination). In the third case, the court dismissed a plaintiff's retaliation claim when he had only pursued age and gender discrimination claims with the EEOC. Curato v. Saluti, No. 98-2703, 1999 U.S. Dist. LEXIS 19844, at *19 (E.D. Pa. Dec. 30, 1990. The court reasoned that since plaintiff's retaliation claim was based on his belief that the counterclaims defendant filed against him were retaliatory, the EEOC could not reasonably be expected to investigate this claim. Id.

adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001).[13] For the purposes of this motion, Silver Lake Center concedes that requesting an accommodation is a protected activity under the ADA and that termination is an adverse action. Instead, Silver Lake Center argues that there is no causal connection between Demshick requesting an accommodation and her termination.

A plaintiff can establish a causal connection by showing temporal proximity between the protected activity and the adverse employment action. Shaner v. Synthes , 204 F.3d 494, 505 (3d Cir. 2000) ("temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is unusually suggestive of retaliatory motive.") (citations omitted); Jalil v. Avdel Corp., 873 F.2d 701, 708-709 (3d Cir. 1989) (finding a causal connection where plaintiff's protected activity was followed by his termination two days later). Silver Lake Center twists the facts to argue there is no temporal proximity because Demshick requested an accommodation in October 2003 and was terminated nine months later in July 2004. While Silver Lake Center initially

[13] To establish a *prima facie* case of retaliation under the PHRA, a plaintiff must demonstrate elements similar to those required under the ADA. A plaintiff must show that "(1) he engaged in a protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge." See Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 509 (3d Cir. 2004) (applying these elements to claims under both Title VII of the Civil Rights Act of 1964 and the PHRA). Retaliation claims under both statutes follow the McDonnel Douglas burden shifting formula.

honored Demshick's request for an accommodation, this changed in May 2004. On July 22, 2004, Demshick learned she was scheduled to work on the second floor on July 27, 2004. Demshick renewed her request for an accommodation, which was denied. Silver Lake Center terminated Demshick within a week of this request, which establishes a causal connection for her retaliation claim. There is no question that Parell, the supervisor who terminated Demshick, also had knowledge of Demshick's request for a reasonable accommodation. Anderson v. Deluxe Homes of Pa, Inc., 131 F. Supp. 2d 637, 656 (M.D. Pa. 2001) (suggesting that as an additional element of the *prima facie* case, the person who performed the adverse action must have knowledge of the plaintiff's protected conduct.)

Even though Silver Lake Center asserts a legitimate non-discrimination reason for terminating Demshick, Demshick's retaliation claim survives summary judgment because she has provided direct evidence of discrimination as well as pretext evidence. See Section A.(2) *supra*.

## IV. CONCLUSION

For the reasons stated above, I will deny defendant's motion for summary judgment. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRACY A. DEMSHICK,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 05-2251** |
| | : | |
| **DELAWARE VALLEY CONVALESCENT** | : | |
| **HOMES, INC., et al.,** | : | |
| **Defendants.** | : | |

**ORDER**

**AND NOW,** this 26th day of April, 2007, upon consideration of defendants' Motion for Summary Judgment (Document No. 26) and plaintiff's response thereto, it is hereby **ORDERED** that the motion is **DENIED**.

BY THE COURT:

/s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.